In the
United States Court of Appeals
For the Seventh Circuit

Nos. 98-3096, 98-3101, 98-3102

Ameritech Benefit Plan Committee, et al.,

Plaintiffs-Appellees,

v.

Communication Workers of America,
Annette Foster-Hall, et al.,

Defendants-Appellants.

and

Bernadette Bernabei,

Plaintiff-Appellant,

v.

Ameritech Corporation, et al.,

Defendants-Appellees.


Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 97-C-1441, 97-C-2209--Suzanne B. Conlon, Judge.


Argued February 9, 1999--Decided July 13, 2000


        Before Cudahy, Ripple, and Diane P. Wood, Circuit
Judges.

        Diane P. Wood, Circuit Judge.  This case is about
the present consequences of the way in which
Ameritech Corporation (and its predecessors)
computed time for purposes of its pension plan,
early retirement, and similar benefits, when the
reason for an approved absence from work was
pregnancy rather than any other short-term
disability. (For the sake of convenience, we
refer throughout to the company as Ameritech,
even though Ameritech did not come into being
until 1984. The difference in corporate identity
makes no difference to the outcome of this case.)
After the passage of the Pregnancy Discrimination
Act (the PDA) in 1979, Pub. L. No. 95-555,
codified at 42 U.S.C. sec. 2000e(k), the
Ameritech Benefit Plan Committee (benefit

committee) did not go back to recompute leave periods for women employees whose absences were because of pregnancy.

This decision took on immediate importance for the affected employees in 1994, when Ameritech added benefits to its pension plan. For these people, indeed, it made the difference between eligibility to take early retirement and to enjoy other pension benefits, and lack of eligibility. In an unusual move, Ameritech jumped into court with an action for a declaratory judgment, and it attempted to sue a defendant class of employees. The district court granted summary judgment for Ameritech, dismissing the class claims under Title VII, ERISA, the Equal Pay Act, and various state laws. We affirm.

I

For the entire time period relevant to this suit, Ameritech has used a record-keeping system it calls Net Credited Service (NCS) for purposes of determining an employee's entitlement to pension and other employment benefits. The NCS system produces a number, created by Ameritech and assigned to each employee, which reflects an adjusted amount of "continuous" employment with which the employee is credited. Each employee's NCS number is based on several factors, including credit that Ameritech gives the employee for time spent working at Ameritech, and credit that it gives the employee for various leaves of absence. In other words, employees receive service credit for actual time worked and for certain leaves, but they do not receive service credit for other leaves. The latter time periods are "squeezed out" or subtracted from the gross time between hire date and the present, before benefit eligibility is determined. Ameritech notes, without contradiction from the employees, that the NCS system is incorporated in both its collective bargaining agreements and in its pension plans.

The addition of the PDA to Title VII, effective April 29, 1979, forced Ameritech to change its method of calculating NCS. For most of the time prior to the advent of the PDA, Ameritech had counted only a maximum of 30 days of an employee's pregnancy or maternity leave towards her NCS (because it was treating pregnancy as a "personal leave" capped by a 30-day limit, instead of as a disability leave). Pregnancy leaves in those days typically lasted much more than 30 days, at Ameritech's insistence: Ameritech required pregnant women to begin their pregnancy leaves several months before their due dates. In contrast, employees with other disabilities were granted full NCS credit for

their disability-related leaves. The PDA, which established that discrimination based on pregnancy is sex discrimination and that pregnancy must be treated the same as any other short-term disability, made it clear to Ameritech that its NCS system had to change. Ameritech accordingly began giving employees full NCS credit for their pregnancy and maternity leaves. It did not, however, adjust the NCS periods of employees who had taken pregnancy or maternity leaves before the effective date of the PDA, April 29, 1979, nor did it discontinue its use of NCS to calculate various employee benefits.

Here matters stood for many years. The stakes for the women who had received only partial credit for their pre-PDA pregnancy leaves became higher in 1994, however, which led to the present litigation. On March 7 of that year, Ameritech amended its pension plan to provide early retirement benefits to some employees. Under the amendments, eligible non-management employees who retired between February 22, 1994, and September 30, 1995 were entitled to have three years added to their terms of employment and three years added to their actual ages for purposes of determining retirement eligibility and calculating the amount of their pension benefits. The same employees were made eligible for additional tuition assistance, as well as cash payments under a Supplemental Income Protection Program. Ameritech's plan administrators used the NCS in calculating each employee's term of employment in order to distribute the benefits. Because employees who had taken pregnancy or maternity leaves prior to April 29, 1979 had lower NCS numbers than they would have had under a system that did not discriminate against pregnancy, some of them did not receive the added 1994 benefits even though they would have been eligible if they had been disabled in any other way.

Cheryl Cuprys and Bernadette Bernabei were two Ameritech employees who had taken pre-April 29, 1979 pregnancy and maternity leaves and were therefore not eligible for the 1994 benefits. Cuprys and Bernabei both challenged their denial of benefits, but Ameritech's benefit committee denied their claims and appeals. Cuprys and Bernabei then turned to the EEOC and filed charges with it. The EEOC issued a right to sue letter to Cuprys on February 24, 1995, and to Bernabei on September 28, 1995.

On December 20, 1995, Bernabei filed suit in the United States District Court for the Northern District of Ohio alleging that Ameritech's actions violated Title VII, the Equal Pay Act, ERISA, and state law (Bernabei v. Ameritech Corp., et al., No. 97-CV-02209). On March 3,

1997, Ameritech filed suit against a claimed defendant class of affected women and against two unions, the Communications Workers of America, AFL-CIO (the CWA) and certain local unions affiliated with the International Brotherhood of Electrical Workers (IBEW), in the Northern District of Illinois. Ameritech's complaint asked for a declaratory judgment that it had not violated any of the same laws invoked in the Bernabei action. Bernabei's suit was transferred to Illinois, and in May of 1997 it was consolidated with Ameritech's declaratory judgment action.

The putative defendant class and the CWA filed their answers, along with counterclaims under Title VII, the Equal Pay Act, ERISA, and the state laws. (Indeed, these claims mirrored Ameritech's request for declaratory relief, which saves this case from undue complication as we explain below.) In an order dated August 28, 1997, the district court approved the parties' joint request for class certification as to the Title VII, ERISA, and state law claims, apparently under Fed. R. Civ. P. 23(b)(1) and 23(b)(2). (The order contains no discussion or explanation of this decision, but these are the rules cited in the earlier motion for certification.) Later, the district court granted Ameritech's summary judgment motion as to all parties, and denied the cross-motions of the CWA, the class, and Bernabei. This appeal followed.

II

A. Subject Matter Jurisdiction

The EEOC, through a brief amicus curiae it has filed with this court, argues that the district court lacked subject matter jurisdiction over Ameritech's Title VII and Equal Pay Act claims, because neither statute provides for suits by the employer against whom discrimination is alleged. Given the fundamental nature of this argument, we address it first. In our view, the district court had subject matter jurisdiction under 28 U.S.C. sec. 1331. It is of course true that the Declaratory Judgment Act, 28 U.S.C. sec. 2201, is not an independent source of subject matter jurisdiction. See GNB Battery Technologies, Inc. v. Gould, Inc., 65 F.3d 615, 619 (7th Cir. 1995); Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671 (1950). It allows suits for declaratory judgment where federal jurisdiction would exist in a coercive suit brought by the declaratory judgment defendant. See GNB Battery Technologies, Inc., 65 F.3d at 619; Franchise Tax Board, 463 U.S. 1, 19 (1983). Had the aggrieved employees (here, class defendants) brought a suit to enforce Title VII and the Equal Pay Act against Ameritech, the district court would have

had jurisdiction over the complaint because interpretation and application of these statutes present federal questions. See Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 89 (1998). Indeed, this is exactly what the employees did when they filed their counterclaims. One way or the other, the claims on all sides present federal questions, and so our jurisdiction is secure.

The Commission is really arguing that the statutes confer no right on Ameritech to sue as a plaintiff, because they confer no such rights on employers (i.e. no claim can be stated) or because it is the wrong party (i.e. it lacks statutory standing). While these could be important points, they do not implicate the jurisdiction of the district court. Our basis for jurisdiction comes from the underlying controversy, not the particular party initiating suit. We note, however, that the question whether an employer should have the right to short circuit the EEOC's internal processes by running to court and filing a declaratory judgment action in a Title VII suit is an important one, which will have to be addressed in a case that raises it properly. The counterclaims and Bernabei's direct action mean that this is not such a case, however, so we leave further discussion of this point to another day.

B.   Ripeness of Ameritech Action

The EEOC argues in the alternative that Ameritech's suit was unripe because the parties failed to exhaust their administrative remedies. At the time Ameritech filed its action, individual charges were still pending before the EEOC's Cleveland office, that office had not completed its consideration of the charges, yet Ameritech named some of those people as defendants. Shortly after Ameritech filed this action, the Commission filed its own suit in the Northern District of Ohio, naming Ameritech, the IBEW, and the CWA as the defendants and asserting claims similar to those that are here. Although Bernabei's suit was transferred to the Northern District of Illinois from the same Ohio district court, that court denied Ameritech's motion to transfer the EEOC case here, and so the Commission's action is still pending there, awaiting the outcome of this appeal.

Had Ameritech not filed its declaratory judgment action, the Commission could have controlled both the timing and the forum of this litigation to a far greater degree. (We note, however, that the Commission is not immune from a transfer of venue under 28 U.S.C. sec. 1404(a), and so this right is not unqualified.) The Commission argues that

the employer should not have the right to thwart its enforcement decisions in the way that Ameritech has done here. In a sense, its argument is that any employer action that is possible (assuming arguendo that such actions exist) must be subject to the same exhaustion requirements that employees face. This too is a reasonable argument, but not one that can carry the day on the facts before us. To begin with, exhaustion is not a jurisdictional requirement for Title VII claims. See Gibson v. West, 201 F.3d 990, 994 (7th Cir. 2000). It is merely a precondition to bringing a Title VII claim in federal court, and is therefore subject to the doctrines of waiver, estoppel, and equitable tolling. See id.

We would have a much more difficult case on our hands if Bernabei and Cuprys had never filed charges with the EEOC, or if the EEOC had not responded to the charges by issuing right-to-sue letters. We do not need to address that hypothetical situation here, however, nor is it necessary for us to address the question whether an employer must file a formal charge with the Commission as a prerequisite to bringing the kind of declaratory judgment action Ameritech filed. In our case, individual charges were filed and the EEOC issued right-to-sue letters. Thus, whatever interests in completion of the Commission's internal procedures may exist were satisfied. We are left with the more conventional problem of competing lawsuits on the same issues in two different federal districts. This does not seem to have bothered the parties much, and it is surely not the kind of fundamental defect that divests the district court of power to rule on the case.

### C. Class Certification

Despite the fact that neither party has addressed the way that class certification was accomplished in this case, we cannot proceed without considering this problem as well. This is so precisely because classes include not only the parties directly before the court, but absentees, and in some cases the active participants may sell out the interests of the others. See, e.g., Crawford v. Equifax Payment Services, Inc., 201 F.3d 877, 882 (7th Cir. 2000); see Pettway v. American Cast Iron Pipe Co., 576 F.2d 1157, 1169 (5th Cir. 1978); Plummer v. Chemical Bank, 668 F.2d 654, 658 (2d Cir. 1982). We look at the alleged defendant class that the district court certified for Ameritech's declaratory judgment under Title VII.

To begin with, there is a potential problem with virtually all defendant classes that proceed

under anything but Rule 23(b)(3). Defendant classes, initiated by those opposed to the interests of the class, are more likely than plaintiff classes to include members whose interests diverge from those of the named representatives, which means they are more in need of the due process protections afforded by (b)(3)'s safeguards. It also means that they are less likely to satisfy the requirements of Rule 23(a). Risks of diverging interests are particularly high in actions seeking monetary remedies. In Phillips Petroleum Co. v. Shutts, 472 U.S. 797 (1985), the Supreme Court discussed the analogous problem of the rights of absentee members of a plaintiff class that sought monetary relief. The Court concluded that nothing less than the type of notice and opt-out opportunity provided by Rule 23(c) (or, in Shutts, the Kansas equivalent to the federal rule) would satisfy due process. Moreover, throughout its discussion, it frequently drew comparisons between the position of absentee plaintiff class members and defendants, and virtually every one of those comparisons implied that defendants have, if anything, greater rights. We are not aware of a single case that has ever justified a monetary award (or, as here, a judgment declaring that a party is entitled to no money) without at a minimum requiring notice be afforded to that party.

Our decision in Henson v. East Lincoln Township, 814 F.2d 410 (7th Cir. 1987), cert. granted, 484 U.S. 923 (1987), cert. dismissed, 506 U.S. 1042 (1993), holds that a defendant class is normally impermissible under Rule 23(b)(2), although it leaves open the possibility of a debtor's bringing a class action against a class of creditors seeking a declaration of nonliability. This is what Ameritech says it has done, but later developments in this circuit's class action jurisprudence make it clear that the district court should not have brushed over the requirements of Rule 23 so quickly. We refer to the decision in Jefferson v. Ingersoll Intern. Inc., 195 F.3d 894 (7th Cir. 1999), in which we made clear that mixed class actions that seek both equitable and compensatory relief must satisfy the formalities of Rule 23(b)(3). See also Lemon v. Intern. Union of Operating Engrs, Local No. 139, 2000 WL 733577, No. 99-4101 (7th Cir., June 9, 2000). As for this, some blame lies at the feet of the class representatives. Paragraph 1 of the counterclaim begins by saying "[t]his counterclaim seeks money damages, declaratory and injunctive relief against Plaintiffs for violations of Title VII, . . . ERISA, . . . the Equal Pay Act, . . . [and certain state laws]." What could be clearer? And yet the record is devoid of any indication that

the absentees had any idea that the case was going on.

The parties did not ask for class certification for purposes of the Equal Pay Act claims, because they recognized that the problems with certifying such a class under the Equal Pay Act are especially great. There is no such thing as a Rule 23 class action in an Equal Pay Act case. The Act, by incorporating the requirements of the Fair Labor Standards Act, compels the use of a more restrictive "opt-in" procedure. 29 U.S.C. sec. 216(b). Nothing of the sort occurred here, once again because neither the district court nor the parties paid appropriate attention to the certification question.

The problem with ignoring these issues is that the rights of persons not before the court are necessarily implicated once a class is certified. We have concluded that the proper way to proceed is to decide the claims of the parties who are clearly before the court: the named plaintiffs and anyone who intervened formally./1 In fact, our resolution of these claims will have a powerful stare decisis effect on the claims absentees might have wanted to assert, but that cannot be helped. By the same token, our ruling in this action will not formally preclude the EEOC in its Ohio action, since the Commission is also not a party before this court. The Ohio court, and the Sixth Circuit in turn should an appeal be taken, will have the right to come to their own conclusions on these issues.

D.  The Unions

As the litigation progressed, only the CWA played an active role in filing papers with the court. Our comments, however, apply in principle to both unions. Apart from their potential role as an organizational representation of their members, the unions had little to say here. Indeed, because the way in which time of service was computed implicates the collective bargaining agreements the unions had with Ameritech, they might have some incentive to defend their earlier actions. For the same reason we have disregarded the role of the absentee class members, we do not reach the legal issues that might be raised in conjunction with the unions' role. Neither party briefed these questions, and it suffices to say here that the unions' participation does not change our view of the merits of the action.

III

We turn, finally, to the merits. Because this appeal comes to us from a grant of summary

judgment, we review the decision of the district court de novo. See Vakharia v. Swedish Covenant Hosp., 190 F.3d 799, 805 (7th Cir. 1999). We construe the record in the light most favorable to the employees, who are entitled as the non-moving parties to a reversal if the record reveals a genuine issue of material fact. See id.

### A.   Title VII

As we have already noted, Title VII prohibits an employer from discriminating against an employee or applicant based on sex, 42 U.S.C. sec. 2000e-2(a), and the PDA provides that for purposes of Title VII discrimination based on sex includes discrimination based on pregnancy. 42 U.S.C. sec. 2000e(k). In light of those indisputable facts, Ameritech freely admits that it could not today calculate its NCS numbers to favor persons who had not taken pregnancy or maternity leave, or in a way that imposed some form of discount on that one type of short-term disability, and then apply those numbers to determine employee benefits. Its point is a different one: it urges that it is too late for the employees to complain about a method of calculation of NCS that applied only to pre-PDA leaves and that has not been in existence at Ameritech since 1979. A Title VII charge must be filed within 180 days after the "alleged unlawful employment practice occurred," unless the plaintiff initially filed charges with an appropriate State or local agency, in which case the charge must be filed within 300 days after the "alleged unlawful employment practice," or within 30 days after receiving notice that the State or local agency has terminated the proceedings--whichever is earlier. 42 U.S.C. sec. 2000e-5(e)(1).

The outcome of this case turns on which of two competing lines of authority provide a better "fit" here. The one on which the employees rely is represented by Bazemore v. Friday, 478 U.S. 385 (1986). In Bazemore, the Court found that an employer's calculation of a discriminatory base salary structure prior to the effective date of Title VII did not leave the employer free to use that tainted base salary structure in determining salaries after Title VII's effective date. Id. at 395-96. See also Wagner v. Nutrasweet Company, 95 F.3d 527, 534 (7th Cir. 1996). Just so here, they say: Ameritech may not use a system for calculating time of service that was tainted by pregnancy discrimination when it makes present decisions about eligibility for benefits.

Intoning the words "bona fide seniority system" does not help Ameritech, in the employees' view,

because the Civil Rights Act of 1991 amended 42 U.S.C. sec. 2000e-5(e) to provide that "an unlawful employment practice occurs, with respect to a seniority system that has been adopted for a discriminatory purpose in violation of this title, . . . when a person aggrieved is injured by the application of the seniority system or provision of the system." The employees conclude that Ameritech's continued use of pre-1979 NCS computations is a fresh violation of the statute, which occurred in 1994. It was then that Ameritech afforded early retirement and various cash benefits to employees who had high enough NCS numbers to retire between February 22, 1994 and September 30, 1995. The company could have decided to give its new benefits to all of its employees based on how long they had worked for Ameritech, and it could have calculated that length of time such that all employees who had been disabled prior to April of 1979 were treated alike. Instead, in applying the 1994 benefits, it decided to hinge them on "NCS," thereby favoring those employees who had not been pregnant prior to April of 1979.

Ameritech (naturally) relies on the other line of cases, represented by United Airlines v. Evans, 431 U.S. 553 (1977), and Delaware State College v. Ricks, 449 U.S. 250 (1980). In Evans, the employer's discriminatory action occurred when it forced a female flight attendant to quit because she got married. 431 U.S. at 554-55. Later, the employer rehired the flight attendant. The Evans Court held that the employer's refusal after the rehiring to "correct" the effects of the past firing by affording her additional seniority did not violate Title VII, because such a refusal was not a discriminatory action in itself. Id. at 557-58. Both male and female employees who had been fired (whether for a non-discriminatory reason or for an unchallenged discriminatory reason) and then re-hired were treated the same for purposes of seniority credit. The continuing impact of the earlier action, within the context of an otherwise neutral system, was not enough to show a present violation. Ricks is similar. There, the College's discriminatory act occurred when it denied plaintiff Ricks academic tenure, allegedly on the basis of his national origin. 449 U.S. at 252. The college fired Ricks a year later, as it fired other academic employees at the expiration of their terminal 1-year contracts. The Court concluded that there was no continuing violation, and that Ricks' claim accrued at the time of the tenure denial. Id. at 257-58.

For a number of reasons, we think that Ameritech has the better of this dispute, though we acknowledge that the line between continuing

violations that arise with each new use of the discriminatory act (e.g., the Bazemore paychecks) and past violations with present effects (e.g., the Evans seniority) is subtle at best. But it is a line the Supreme Court has drawn, and it is our obligation to apply it if at all possible. First is the fact, simplistic as it may seem, that our case involves computation of time in service-- seniority by another name--followed by a neutral application of a benefit package to all employees with the same amount of time. That suggests that we should look first to Evans, and follow the other line only if there is no alternative. It is true that Bazemore was decided nine years after Evans, but the Bazemore Court said nothing about overruling Evans, and so we assume that it did not do so.

The statute itself offers good reason to treat seniority systems with special care, because it specifically exempts discriminatory effects that flow from bona fide seniority systems from the definition of unlawful employment practices, as long as the differences are not the result of an intention to discriminate. 42 U.S.C. sec. 2000e-2(h). If the employees are able to show intentional discrimination, their action accrues at the time they are injured by the seniority system--that is, when they are denied benefits. 42 U.S.C. sec. 2000e-5(e).

In our opinion, these employees cannot show the kind of intentional discrimination that would trigger the exception to the statutory protection afforded to seniority systems. As Ameritech points out, prior to the adoption of the PDA an authoritative Supreme Court decision had held that Title VII did not prohibit distinctions based on pregnancy. General Electric Co. v. Gilbert, 429 U.S. 125 (1976). Moreover, the PDA has not been treated as a retroactive statute, see Condit v. United Air Lines Inc., 631 F.2d 1136, 1139-40 (4th Cir. 1980); Schwabenbauer v. Board of Ed. of City Sch. Dist. of City of Olean, 667 F.2d 305, 310 n. 7 (2d Cir. 1981); Whitehead v. Oklahoma Gas & Elec. Co., 187 F.3d 1184, 1193 (10th Cir. 1999), and so Ameritech would have had no reason to think it had to reshuffle its NCS list after the Act was passed. Third, the Supreme Court has held that the fact that a seniority system perpetuates pre-Act discrimination does not preclude it from being bona fide. See International Brotherhood of Teamsters v. United States, 431 U.S. 324, 352-53 (1977). The employees here protest that they are not talking about a seniority system, but they are wrong. Under the Supreme Court's test in California Brewers Ass'n v. Bryant, 444 U.S. 598, 606 (1980), the key to deciding whether a decision-making process qualifies as a seniority system is its reliance on relative lengths of employment.

That is what Ameritech's NCS system does, and we think it fits easily into the seniority system line of cases.

Last, this is not a case like some continuing violations where the employees had no way of knowing that something bad had happened to them until much later. Hostile environment sexual harassment cases, for example, can only be brought once it becomes clear that the harassment is severe or pervasive enough to constitute an adverse effect on terms and conditions of employment. Here, the women knew the minute they took their pregnancy or maternity leaves that they were not getting full credit for their time off. No later than the time when Ameritech amended its plan in response to the PDA, they knew that their NCS had not been amended. It is no secret to any employee that seniority rolls like Ameritech's NCS make a difference for a host of employee benefits, some present, and some future. Ameritech informed each employee periodically of his or her accrued NCS. The time for bringing a complaint was therefore long ago, and the district court correctly recognized that these employees had sued too late.

B.    The Equal Pay Act

The employees next challenge Ameritech's procedures under the Equal Pay Act. (As before, we are addressing only the claims of the named plaintiffs and anyone who properly intervened before the district court.) We assume for the sake of argument that the employees have satisfied their initial burden under the statute to show that Ameritech pays women less than men for "equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. sec. 206(d)(1); see Corning Glass Works v. Brennan, 417 U.S. 188, 195 (1974). On the record here, the only difference between the complaining employees and their colleagues who were able to receive the 1994 benefits is that they were pregnant women before April of 1979.

But once again, the fact that the disadvantage from which they suffer is the result of a bona fide seniority system dooms their claim. The Equal Pay Act provides that there is no violation if the unequal pay was due to "any other factor other than sex," including "(i) a seniority system; (ii) a merit system; [or] (iii) a system which measures earnings by quantity or quality of production." 29 U.S.C. sec. 206(d)(1). This is an affirmative defense for the employer, see Corning Glass Works, 417 U.S. at 196, but for the same

reasons we have just reviewed for purposes of Title VII, we find that Ameritech has met its burden. In addition, we agree with Ameritech that the Equal Pay Act claim is untimely. Claims arising under that statute must be filed within two years of their accrual, 29 U.S.C. sec. 255(a), and these claims were not presented until many years after the initial decision not to adjust the employees' time in service for pre-1979 pregnancy leaves.

C.   ERISA

The employees' final federal claims involve ERISA. First, they believe that Ameritech violated its duty under ERISA to act in the best interest of all the plan beneficiaries and participants when it discriminated against certain female beneficiaries of the plan. ERISA fiduciaries are required to act with care and skill "solely in the interest of the participants and beneficiaries." 29 U.S.C. sec. 1104(a). Ameritech is a fiduciary under ERISA, because it has discretion and control in implementing the plan. See 29 U.S.C. sec. 1002(21)(A); Administrative Committee v. Gauf, 188 F.3d 767, 770 (7th Cir. 1999). Second, the employees argue that Ameritech violated section 510 of ERISA, which prohibits employers from frustrating their employees' attainment or enjoyment of benefit rights. 29 U.S.C. sec. 1140; see Feldman v. American Memorial Life Ins. Co., 196 F.3d 783, 792 (7th Cir. 1999). Individuals may bring claims to recover benefits, to enforce rights, and to clarify rights under 29 U.S.C. sec. 1132(a)(1)(B).

Even if we agreed that the employees' ERISA claims were timely, perhaps because they arise more directly out of the 1994 plan amendment than the Title VII or Equal Pay Act claims, the ERISA claims face an additional hurdle. In order for the employees to show that Ameritech breached either a fiduciary duty or section 510, the employees must be able to show that they were, at some time, eligible for the plan's benefits. Fiduciaries are required to act "in accordance with the documents and instruments governing the plan." 29 U.S.C. sec. 1104. Any breach of the fiduciary duty must derive from Ameritech's implementation of the plan. For its part, section 510 only applies if the employees can show (among other things) that they were qualified under the plan for the denied benefits. See Feldman, 196 F.3d at 792. If the plan itself provides for discriminatory practices, such that they do not qualify for benefits under its terms, they cannot prevail on an ERISA claim.

The employees stress that the plan refers to "TOE," or "time of employment," and not NCS. They maintain that TOE does not necessarily need to be calculated using NCS, and that they would be eligible for the benefits of the plan if their time of employment was calculated in the same way as it would be for other previously disabled employees. Nevertheless, Ameritech's decision to use NCS to calculate time of employment cannot evidence an intent to discriminate if the NCS system itself has passed muster under the antidiscrimination laws.

Furthermore, there may be a problem with shoe-horning a discrimination claim into the ERISA notion of fiduciary duty, because ERISA "does not itself proscribe discrimination in the provision of employee benefits." Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 91 (1983). Shaw found that a state law prohibiting discrimination was preempted by ERISA, because it "related to" the area of benefits, which is covered by ERISA. Id. at 99. Ameritech argues that the Shaw Court also insinuated that ERISA would not be a source of protection against such discrimination. The Court said that discriminatory practices would have to be evaluated under Title VII, rather than a broad state law, and did not specifically include the option of resorting to ERISA. Id. at 105-06. But the Shaw Court was not presented with and did not answer the question of whether discrimination against certain plan participants could ever reach the point of breaching fiduciary duties. We have no need to decide whether such a claim might be stated in some future case; we conclude only that this is not such a case.

ERISA's fiduciary duty was meant to hold plan administrators to a duty of loyalty akin to that of a common-law trustee. See John Langbein, "The Supreme Court Flunks Trusts," 1990 Sup. Ct. Rev. 207, 210-11. A common-law trustee was not allowed to favor one class of beneficiaries over another. Restatement of Trusts sec. 183. A plan administrator's duty to act in the best interest of all the beneficiaries cannot mean that it must cater to the optimal needs of each individual beneficiary. All of the beneficiaries' interests will not always be aligned. The fiduciary must act as though it were a reasonably prudent businessperson with the interests of all the beneficiaries at heart. The question is whether such a businessperson, facing potential risks of future litigation as well as possible employee disenchantment with the plan, would have chosen to adhere to the NCS system, with the consequent effect of denying the 1994 benefits to the women affected here. See 29 U.S.C. sec. 1104(a)(1)(B). The answer must be yes, since adherence to the system for all participants meant that the

company had a reliable seniority list upon which everyone could rely for any appropriate purpose.

IV

The district court's order granting summary judgment also awarded judgment to Ameritech on the state law claims, because they mirrored the federal claims. The appellants have not contested that part of the court's decision on appeal, and so we consider any possible arguments waived.

For the reasons stated, we AFFIRM the judgment of the district court.

/1 These plaintiffs include (aside from the unions) Bernadette Bernabei, the original named individual defendants in Ameritech's declaratory judgment suit (Annette Foster-Hall, Brenda Gibson, Wilbur Haynes, Helen Kloess, H. Carleen Leach, Sharon Parrish, Frances Timmerman, Phyllis Barnes, Betty Bober, Janet Champer, Linda Croddy, Patricia Elick, Lesle Gardner, Dolores Harmacinski, Polly Neimeier, Debby Flynn Adomaitis, Anne Marie Allen, Carol Amato, Vicki Andrews, Evelyn Dallos, Leanne Grover, Ruth Johnson, Virginia Jones, Francie Wingo, Sara Sue Adkins, Debra Anderson, Janet Appleton, Sandra Ballard, Kathryn Kreger, Margaret Perrill, Diane Richard, Brenda Smitherman-Muir, Mary Jo Avery, Diana Beattie, Christine Berger, and Shirley Connell), and those individuals whom the district court allowed to intervene (see Agreed Amended Motion to Intervene Certain Class Members, Exhibit A).